Opinion filed February 8, 2007




















 
 
  
 
 







 
 
  
 
 




Opinion filed February 8, 2007

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                 ____________

 

                                                          No. 11-05-00238-CR 

                                                     __________

 

                               EDWARD
WAYNE BRYANT, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS,
Appellee

 



 

                                         On
Appeal from the 266th District Court

 

                                                           Erath County, Texas

 

                                                Trial
Court Cause No. CR 12033

 



 

                                                                   O
P I N I O N

 

Edward Wayne Bryant was indicted in Cause No. CR
12033 for the capital murder of Henry Lee Bryant III and in Cause No. CR 12034
for the capital murder of Anita Bryant. 
The State elected to try Cause No. CR 12033 first and waived the death
penalty in that cause.  The jury found
appellant guilty of the capital murder of Henry Lee Bryant III, and the trial
court sentenced appellant to confinement for life in the Institutional Division
of the Texas Department of Criminal Justice.








In appellant=s
first four points of error, he argues that his oral statements to the Texas
Rangers should have been suppressed because they questioned him prior to
advising him of his Miranda rights.[1]  In appellant=s
fifth and sixth points of error, he argues that the evidence was legally and
factually insufficient to sustain his conviction.  And in appellant=s
seventh and final point of error, he argues that the trial court erred in
admitting hearsay testimony from a witness who heard Anita Bryant say she did
not want appellant and his friend coming back to her house.  We affirm.

The Motion to Suppress

Texas Ranger Freeman Martin was the only witness
at the pretrial hearing on appellant=s
motion to suppress.  Ranger Martin and
Ranger David Rainwater were stationed in Houston.  Ranger Martin received a telephone call from
Ranger Joe Hutson around 4:00 p.m. on August 9, 2004.  Ranger Hutson, who was stationed in
Stephenville, was at the Dublin
residence of Henry and Anita Bryant. 
There was a large amount of blood inside the residence, and Ranger
Hutson was trying to locate the couple.

Ranger Hutson told Ranger Martin that Henry Bryant
had a brother named Wayne who lived in the Houston area and that the
brother was the only family member who might be contacted. Ranger Hutson told
Ranger Martin that neighbors of the Bryants had seen a dark-colored, four-door
vehicle parked in front of their residence on August 7 and that there were some
Abloody shoe impressions@ at the residence.  Ranger Hutson asked Ranger Martin to
interview the brother to see if he could provide information concerning Henry
and Anita Bryant.

A research specialist for the Texas Rangers
located the address of a person named Edward Wayne Bryant who at one time had
lived at the same address as Henry Bryant. 
The current address was an apartment in Houston. 
Ranger Martin spoke with the apartment manager at approximately 6:30
p.m. on August 9, but the manager said that he had not seen Edward Wayne Bryant
in a week.  The manager then gave the
Rangers a copy of the lease agreement which listed Henry Bryant as the
emergency contact.  








The apartment manager called Ranger Martin at 1:00
a.m. on August 10, stating that appellant had returned and was Acarrying boxes of merchandise and
shopping bags@ into the
apartment.  The Rangers went back to the
apartment building, arriving there at 2:15 a.m.; noticed a dark four-door Kia
passenger car; and went directly to appellant=s
apartment.  When appellant answered their
knock, Ranger Martin told him that his brother and sister-in-law were missing
and that they wanted to know if appellant knew of any enemies of the Bryants or
where they might be located.  Appellant
agreed to assist in any way that he could. 
Because of the apartment=s
location in a bad area of Houston
and the sensitive nature of their visit, Ranger Martin asked if they could step
inside the apartment to visit privately. 
Appellant commented that his apartment was messy but let the Rangers in.

Entering the small apartment, Ranger Martin
noticed that there were shopping bags from several businesses and new VCRs
still in their boxes.  When Ranger Martin
asked appellant if he had been shopping, appellant said that he had saved some
money and had gone shopping.  Ranger
Martin next noticed a piece of spiral notebook paper lying on the bed just
inside the front door of the apartment. 
The paper had three handwritten signatures AAnita
H. Bryant@ and one AAnita H.@  When asked about the paper, appellant said
that he did not know where the paper came from.

Ranger Martin then asked appellant if he had been
to visit Henry and Anita in Dublin.  Appellant replied that he had been to visit
them three weeks ago, that he went alone, and that he had been surprised that
the visit went well.  Ranger Rainwater
asked why, but appellant ignored the question. 
Ranger Martin then asked appellant where he had been the past few days,
and appellant said that he had been in Galveston
camping out with a friend named David Mack. 
Because Ranger Martin had not heard of David Mack, he asked how to
contact Mack.  Appellant said that Mack
lived in Edna.  Appellant also told
Rangers Martin and Rainwater that he had rented a car from Avis for the trip to
Galveston and
described the Kia that they had seen outside the apartment building.








Ranger Martin then noticed Awhat
appeared to be dried blood on the black tennis shoes [appellant] was wearing.@ 
Ranger Martin asked appellant to show him the bottom of appellant=s tennis shoes, and appellant
complied.  Ranger Martin noted that the
sole pattern appeared to be very similar to the footprint impressions that
Ranger Hutson had described seeing at the Bryants=
residence.  Ranger Martin testified that
at that point the Rangers did not believe that they had probable cause to
arrest appellant, that appellant was not under arrest, and that they would have
had to leave if appellant had asked them to leave.  Ranger Martin said that he simply asked
appellant for written consent to search the apartment and that appellant
agreed.  Appellant also gave written
permission for the Rangers to search the car. 
Ranger Martin testified that appellant freely and voluntarily signed the
consent to search.

Ranger Martin did a pat-down search of appellant
and removed from his pockets Texas
drivers= licenses
and credit cards that were in the names of Henry and Anita Bryant.  The Rangers seized appellant=s tennis shoes, a black spiral notebook
containing police scanner frequencies, a Wal-Mart sack containing miscellaneous
papers and documents bearing the names of Henry and Anita Bryant, two Uniden
walkie-talkie radios, a Radio Shack police scanner, a Texas map that was opened
and folded to the Dublin area, a new Emerson 4-head VCR, a new Sanyo 4-head
VCR, a new Cyber Home DVD player, a Dual Trunking 1000 channel scanner, and a
Symphonic 9-inch TV/VCR combination unit. 
Noting that appellant became more and more nervous as they searched, the
Rangers told him that he was not under arrest but that for their safety and his
safety they were placing him in handcuffs. 
Ranger Martin did not ask appellant any more questions.  After searching the car, the Rangers took
appellant to the Harris County District Attorney=s
office where they detained him until Ranger Hutson could secure an arrest
warrant in Erath County. 
They served the arrest warrant on appellant at approximately 6:00 a.m.
on August 10.  At that point, the Rangers
read appellant his Miranda and statutory rights, and appellant refused
to answer any further questions.

Ranger Martin stated that he and Ranger Rainwater
then went to Edna and located David Mack who lived at his brother=s residence.  Mack gave them a statement implicating
himself and appellant in the murders of Henry and Anita Bryant.  Ranger Martin testified that, prior to that
time, he did not know the Bryants were dead. 
Mack agreed to take the Rangers to the location in Oklahoma where he and appellant had taken
the bodies, and he subsequently took Rangers Hutson and Drew Carter to the
location.








During cross-examination, Ranger Martin stated
that he had not gone to appellant=s
apartment Awith the
intent to arrest anybody,@
that when they asked appellant if they could speak with him inside appellant=s apartment it was not for the purpose
of looking around, and that appellant had opened the apartment door and invited
them in.  Ranger Martin acknowledged
that, when he saw the AAnita
Bryant@
signatures, he believed that he had authority for an investigative detention
but not enough for a formal arrest. 
Ranger Martin also confirmed that he did not discover the drivers= licenses and credit cards until after
appellant had given his written consent to search. Ranger Martin stated that he
placed the handcuffs on appellant while they were conducting the search because
it appeared that appellant was looking around the apartment for a weapon.

The court made the following findings:  appellant=s
oral statements made prior to his being handcuffed were voluntarily given and
made without coercion, threats, or promises; those oral statements were not the
result of custodial interrogation because appellant was not under arrest or in
custody at the time of the oral statements; and appellant was free to leave or
ask the officers to leave until the time that he was handcuffed.  The court then held that appellant=s oral statements made before he was
handcuffed were admissible as evidence and overruled appellant=s motion to suppress.

A trial court=s
ruling on a motion to suppress is reviewed for an abuse of discretion.  Balentine v. State, 71 S.W.3d 763, 768
(Tex. Crim.
App. 2002).  In reviewing a trial court=s ruling on a motion to suppress,
appellate courts must give great deference to the trial court=s findings of historical facts as long
as the record supports the findings.  Torres
v. State, 182 S.W.3d 899, 902 (Tex.
Crim. App. 2005); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  Because the trial court is
the exclusive fact-finder, the appellate court reviews evidence adduced at the
suppression hearing in the light most favorable to the trial court=s ruling.  Carmouche v. State, 10 S.W.3d 323, 327
(Tex. Crim.
App. 2000).  We also give deference to
the trial court=s rulings
on mixed questions of law and fact when those rulings turn on an evaluation of
credibility and demeanor.  Guzman,
955 S.W.2d at 89.  Where such rulings do
not turn on an evaluation of credibility and demeanor, we review the trial
court=s actions
de novo.  Id.; Myers v. State, 203
S.W.3d 873 (Tex. App.CEastland
2006, pet. ref=d).








  In
appellant=s first
three points of error, he asserts that his rights guaranteed under the Fifth
and Fourteenth Amendments to the U.S. Constitution; Article 1, section 10 of
the Texas Constitution; and Article 38.22 of the Texas Code of Criminal
Procedure[2]
were violated when the Rangers questioned him prior to advising him of his Miranda
rights.  Appellant=s
fourth point of error asserts that the trial court erred in overruling his
motion to suppress the oral statements for the same reasons.  

Appellant=s
arguments are based on a contention that he was Ain
custody@ from the
time the Rangers first contacted him and, therefore, the Rangers were required
to give him the Miranda warnings and to comply with the requirements of
Article 38.22.  We disagree.  There are three distinct types of encounters
between law enforcement officers and citizens: 
the voluntary encounter, the investigative detention, and the arrest
(custody).  See
State v. Perez, 85 S.W.3d 817, 819
(Tex. Crim.
App. 2002).  The procedural safeguards
referred to by appellant in his first four points of error only apply when the
citizen is in custody or under arrest.  Miranda,
384 U.S.
at 444; Dowthitt v. State, 931 S.W.2d 244, 254-55 (Tex. Crim. App.
1996).  The trial court correctly held that
appellant was not in custody when he made the following oral statements to
Ranger Martin:  that he had visited his
brother three weeks earlier, that he had spent the last few days camping with
David Mack in Galveston, and that he did not know where the page with the
signatures of AAnita
Bryant@ had come
from.

 A person is
Ain custody@
only if, under the circumstances, a reasonable person would believe that his
freedom of movement was restrained to the degree associated with a formal
arrest.  Stansbury v. California, 511 U.S. 318, 322 (1994); Dowthitt,
931 S.W.2d at 254.  The Areasonable person@ standard presupposes an innocent
person.  Florida
v. Bostick, 501 U.S.
429, 438 (1991); Dowthitt, 931 S.W.2d at 254.  A subjective intent of law enforcement
officials to arrest is irrelevant unless that intent is somehow communicated or
otherwise manifested to the suspect.  Stansbury,
511 U.S.
at 322-26; Dowthitt, 931 S.W.2d at 254. 
Ranger Martin maintained that he did not have probable cause to arrest
appellant until after he had seized the items during the search and had
handcuffed appellant.  The only action
that could arguably be considered a signal to appellant that he was being
arrested was when he was handcuffed, and that was well after appellant had made
the oral statements.  Appellant=s first four points of error are
overruled.

Legal and Factual Sufficiency of the Evidence








In his fifth and sixth points of error, appellant
contends that the evidence is legally and factually insufficient to support his
conviction.  In order to determine if the
evidence is legally sufficient, we must review all of the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact
could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v. Virginia,
443 U.S. 307 (1979); Jackson v. State, 17 S.W.3d 664 (Tex. Crim. App.
2000).  To determine if the evidence is
factually sufficient, the appellate court reviews all of the evidence in a neutral
light.  Watson v. State, 204
S.W.3d 404, 414 (Tex. Crim. App. 2006) (overruling in part Zuniga v. State,
144 S.W.3d 477 (Tex. Crim. App. 2004)); Johnson v. State, 23 S.W.3d 1,
10-11 (Tex. Crim. App. 2000); Cain v. State, 958 S.W.2d 404, 407-08
(Tex. Crim. App. 1997); Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim.
App. 1996).  Then, the reviewing court
determines whether the evidence supporting the verdict is so weak that the
verdict is clearly wrong and manifestly unjust or whether the verdict is against
the great weight and preponderance of the conflicting evidence.  Watson, 204 S.W.3d at 414-15; Johnson,
23 S.W.3d at 10-11.  The jury, as the
finder of fact, is the sole judge of the weight and credibility of the
witnesses=
testimony.  Tex. Code Crim. Proc. Ann. art. 36.13 (Vernon 1981), art. 38.04 (Vernon 1979).

Appellant=s
first argument is that the prosecution failed to prove every element of the
offense of capital murder.  The grand
jury indicted appellant under Tex. Pen.
Code Ann. '
19.03(a)(7) Vernon Supp. 2006) for the murder of more than one person during
the same criminal transaction:

[Appellant]
on or about the 7th day of August, A.D., 2004, . . . did then and there
intentionally or knowingly cause the death of an individual, namely, Henry Lee
Bryant, III, by hitting or striking him with a hammer or mallet, and did then
and there intentionally or knowingly cause the death of another individual,
namely, Anita Bryant by hitting or striking her with a hammer or mallet, and
both murders were committed during the same criminal transaction.

 

Appellant asserts that there is little or no evidence that
appellant caused their deaths by hitting or striking them with a hammer or
mallet.  Appellant=s
alternative argument is that he was compelled to participate in this crime by
Mack=s threat
of imminent death or serious bodily injury if he did not participate.








Appellant=s
first argument ignores the inclusion in the court=s
charge of a charge on the law of parties. 
A person is criminally responsible as a party to an offense if the
offense is committed by his own conduct, by the conduct of another for which he
is criminally responsible, or by both. Tex.
Pen. Code Ann. '
7.01(a) (Vernon 2003).  A person is
criminally responsible for an offense committed by the conduct of another if,
acting with the intent to promote or assist the commission of the offense, he
solicits, encourages, directs, aids, or attempts to aid the other person to
commit the offense.  Tex. Pen. Code Ann. ' 7.02(a)(2) (Vernon 2003).

The State presented eighteen witnesses who
testified concerning DNA and other physical evidence that demonstrated that
appellant had been directly involved in the two murders.  The State=s
first witness was the biological son of the Bryants.  Henry Lee Bryant IV identified a watch
recovered on the male body in Oklahoma
as belonging to his father.  He testified
that his parents owned a Chevrolet pickup and a gray Toyota Camry.  Bryant also stated that he had provided some
of his DNA to Brent Watson at the Texas Department of Public Safety Laboratory
in Waco, and he
identified appellant as his uncle.

Karen Wright testified that Henry Bryant had
worked in maintenance at the Dr. Pepper Bottling Plant and that Anita Bryant
had worked in the museum there.  She
testified that the Bryants had collected Dr. Pepper memorabilia prior to their
moving to Dublin
and that their collection was valuable. 
Wright stated that she knew that appellant had visited the Bryants
because she overheard a conversation in the Dr. Pepper soda shop in which Anita
stated that she did not want appellant and his friend coming back to their
house or staying at their house.  In
response to appellant=s
hearsay objection, the court allowed the testimony as an exception to the
hearsay rule under Tex. R. Evid. 803(3)
as a statement of Anita Bryant=s
then-existing mental or emotional state. 
Wright also testified that Anita Bryant had been at work on August
6.  When Anita Bryant failed to show up
for work on August 9, Wright and another employee went to the Bryants= home, opened the back door, saw the
Bryants= dog barking
frantically, and called Chief of Police Lannie Lee of the Dublin Police
Department.  Wright related the efforts
to locate the Bryants.  Wright related
that, when the police entered the Bryants=
garage, they called the Texas Rangers and started putting up yellow police
tape.

The next witness was the Bryants= next-door neighbor, Debra Carol
Franklin.  On Saturday, August 7, she saw
Henry Bryant starting to mow his lawn. 
Around dark on August 7, she noticed a car parked close to the Bryants= garage as if the Bryants had
company.  Around 1:00 a.m. on August 8,
when her daughter arrived home, Franklin
noticed that the outside lights on the Bryants=
garage were on which was unusual.








Chief of Police Lannie Lee, the fourth witness,
testified about the discovery of what appeared to be dried blood in the garage
and a significant quantity of blood on the second floor of the garage with a
tooth lying in the middle of the blood. 
Chief Lee and Officer Tommy Gene Williford of the Dublin Police had
responded to Wright=s
telephone call on August 9.  Lieutenant
Benny Payne of the Dublin Police also was with Chief Lee when they discovered
the blood.  After their discovery, they
notified Texas Ranger Joe Hutson and turned the investigation of the crime
scene over to him.

Lieutenant Payne, the fifth witness, described the
crime scene and how they tried to find personal effects (drivers= licenses, billfolds, credit cards, or
checkbooks) of the Bryants.  The officers
believed that the Bryants might have been robbed.  In checking on the Bryants= bank accounts, Lieutenant Payne saw
checks purporting to be signed by Anita Bryant and payable to appellant.  State=s
Exhibit 52 was identified as a check for $9,500, from the Guaranty Bank in
Pearland, payable to appellant and drawn on the account of H.L. Bryant III and
Anita Bryant.  State=s Exhibit 53 was identified as a check
for $3,700, from the First National Bank of Dublin-DeLeon-Gustine, payable to
appellant and drawn on the account of H.L. Bryant III and Anita Bryant.  Both checks were dated August 6, 2004,
contained the statement Apayment
on settlement,@and had
been endorsed by appellant.  Lieutenant
Payne testified that he located twenty-two letters from appellant to Henry
Bryant.  He also identified evidence that
he had received from the medical examiners in Oklahoma City.

Officer Williford, an investigator with the Dublin
Police, was the sixth witness.  Officer
Williford testified that he helped the lab technicians from the Waco crime lab in their
investigation of the garage crime scene. 
Officer Williford stated that he had not been able to locate any type of
billfold for either of the Bryants but that he did find credit cards, credit
card statements, and bank statements. 
Officer Williford identified State=s
Exhibit 54 which was a credit card statement showing that Anita Bryant=s Bank One credit card had been used on
August 8, 2004, at Brookshire=s
in Clifton, Best Buy in Waco,
Golden Corral in Waco,
and Wal-Mart in Bellmead.  The statement reflected
that her credit card was used on August 9, 2004, at a Shell station in Houston, at a Wal-Mart in Houston,
at a McDonald=s in Houston, at a Radio Shack in Victoria,
at a Wal-Mart in Victoria, at a Mexican restaurant
in Victoria, and at a Chevron station in Rosenberg.








Texas Ranger Joseph Benjamin Hutson was the next
witness.  Ranger Hutson was called by
Lieutenant Payne on August 9 to the Bryants=
residence.  When he entered the garage,
Ranger Hutson observed an unfinished staircase with drag marks down the
staircase that appeared to be dried blood. 
He then observed further bloody drag marks in a room at the top of the staircase.  There was blood on the ceiling, on the walls,
and on the rafters and a human tooth lying in one of the pools of blood.  Near the bottom of the stairs, Ranger Hutson
saw partial bloody footprints with a distinctive pattern, a lot of blood
(one-half inch deep) in the bathroom, and blood in the main area of the
garage.  It appeared that someone had
tried to clean up the blood, but there was too much to clean up.  There was blood dripping through the garage
ceiling.  Pictures of the crime scene
were introduced through Ranger Hutson. 
Ranger Hutson testified that the hitting of someone with a hammer or
mallet could account for the amount and splattering of blood in the garage.

Ranger Hutson called the Department of Public
Safety Crime Laboratory personnel in Waco and Austin to investigate the
crime scene.  The Waco
lab provided trace evidence and DNA experts, and the Austin lab provided fingerprint experts and
crime scene photographers.  Ranger Hutson
testified that, in his opinion, the blood evidence at the scene indicated that
the injuries to the victims occurred in the same criminal transaction.

Ranger Hutson stated that, when people are
missing, the Rangers try to contact relatives. 
He knew that the son was in California
and that the only other relative was appellant. 
Ranger Hutson called the Ranger Headquarters in Houston and was put in contact with Ranger
Martin.  He explained to Ranger Martin
that he was working a missing persons case, that the Bryants probably had been
killed, that he had some distinctive bloody sole prints, but that he had no
suspects.  Ranger Hutson asked Ranger
Martin to see if he could locate appellant. 
Their conversation was at approximately 4:00 p.m. on Monday, August 9,
2004.  Ranger Martin called Ranger Hutson
back at around 7:00 p.m., telling him that he had gone to appellant=s apartment but that no one was
home.  Ranger Hutson told Ranger Martin
not to spend a lot of time running a surveillance on an apartment appellant
might not live in and to just check by the next morning to see if he could
interview appellant.  Ranger Hutson said
that he then received a call at 2:15 a.m. the next morning from Ranger Martin
who stated that he and Ranger Rainwater had heard from the apartment manager
and that the two Rangers were on their way to interview appellant.  Based on his receiving another call from
Ranger Martin an hour or so later, Ranger Hutson obtained an arrest warrant for
appellant and faxed it to Rangers Martin and Rainwater at the district attorney=s office in Houston.








Ranger Hutson also worked on collecting video
evidence of who might have used Anita Bryant=s
credit card.  Ranger Hutson identified
State=s Exhibit
61, which is a video of appellant and Mack using Anita Bryant=s credit card at the Wal-Mart in Houston on the morning of
August 9.  By 10:00 a.m. on August 10,
Ranger Hutson and another Ranger looked at the video at the Wal-Mart store in Houston.  On August 11, Ranger Hutson took possession
of appellant=s tennis
shoes from Ranger Martin and delivered them to the Waco crime lab.  Ranger Hutson also identified State=s Exhibit 5, Mack=s shoes, and acknowledged that both
pairs of shoes appeared to have the same sole pattern.  Ranger Hutson also described how Mack had
taken the Rangers to where the bodies of the Bryants were located in Oklahoma.  The bodies were wrapped in U-Haul blankets
with plastic trash bags over the blankets held with duct tape.

Finally, Ranger Hutson identified records from the
Wells Fargo Bank of appellant=s
account that showed appellant had received $200 in cash when he deposited the
$3,700 and $9,500 checks drawn on the Bryants=
accounts.  Ranger Hutson also identified
a letter from Henry Bryant to appellant that was found in appellant=s apartment.  In the letter, Henry Bryant advised appellant
that he could not give appellant any more money.  During cross-examination, appellant=s attorney asked Ranger Hutson if Mack
had taken them to where the hammers were. 
Ranger Hutson replied that Mack had told them that the hammers were just
a few miles away from where the Bryants=
bodies were discovered but that Mack could not recall that location.  On redirect, Ranger Hutson said that Mack had
said that they used more than one hammer. 
On recross, appellant asked if the hammers that were used to kill the
Bryants came from the workbench in the garage. 
Ranger Hutson replied, ANo,
sir, according to the information we had, they brought the hammers with them.@








  Ranger
Martin was the eighth witness.  Ranger
Martin repeated the testimony that he gave at the motion to suppress hearing
concerning the interview of appellant, his observation of all the new
merchandise in appellant=s
apartment, the search and seizure of items in appellant=s
apartment, and the fact that appellant had quit his job at Luther=s Barbecue two weeks prior to August 9,
2004.  Ranger Martin admitted that he did
not know who signed the three signatures of AAnita
H. Bryant@ and the
one signature of AAnita H.@ that he found in appellant=s apartment but that it appeared that
someone was practicing forging her signature. 
Ranger Martin identified the bundle of the Bryants= credit cards and their drivers= licenses that he found in appellant=s pockets after appellant had signed
the written consent to search.  Numerous
exhibits for the State relating to the use of the Bryants= credit cards and checks were
introduced through Ranger Martin.  He
also identified the police scanner and the black spiral notebook found in
appellant=s
apartment that had the law enforcement frequencies that could be monitored with
a police scanner.

After placing appellant under arrest, Rangers
Martin, Rainwater, and Aldophus Pressley drove to Edna and contacted Mack.  They obtained a written consent to search his
residence.  They noticed blood on Mack=s tennis shoes and his T-shirt and
seized them.  A photograph of Mack=s hands showed small cuts.  Ranger Martin testified that Mack agreed to
take them to Oklahoma
to find the bodies.  Mack told him that
three hammers were used.  Ranger Martin
testified that Mack=s
residence was much larger than appellant=s
apartment.  Mack also had a 7-Up bottle
that came from the Bryants=
home.  Mack told Ranger Martin that he
and appellant had been planning for months to kill and rob the Bryants.

The next witness was Dr. Inas Z. Yacoub with the
Oklahoma Medical Examiner=s
Office.  Dr. Yacoub, who is Board
Certified in Forensic Pathology, reported her results from the autopsies of the
bodies of Henry and Anita Bryant.  Henry
Bryant had at least ten blunt force injuries to his head that were associated
with fractures to his skull.  Brain
matter could be seen coming out of one of the wounds.  There were two rib fractures on his right
side.  Dr. Yacoub characterized the
fractures of Henry Bryant=s
middle and ring fingers as indicative of a person trying to ward off a
blow.  Dr. Yacoub testified that the
blunt force traumas were consistent with blows from a hammer or mallet.  Dr. Yacoub=s
autopsy of Anita Bryant revealed similar blunt force traumas to her head with
one skull fracture showing brain matter. 
Anita Bryant was missing a tooth. 
Dr. Yacoub=s opinion
was that the cause of Anita Bryant=s
death was blunt force trauma to the head and neck, injuries that could be
caused by a hammer or mallet.

The next witness was Erin Casmus with the Texas
Department of Public Safety Crime Lab in Waco.  Casmus worked with the DNA Serology
Section.  Casmus=s
job was to prepare items of evidence so they could be analyzed by the DNA
expert, Brent Watson.  There were over
fifty items that were received by her laboratory, including swabs of stains
from the second floor of the garage, the bathroom floor, the trunk liner of the
Toyota Camry, appellant=s
tennis shoes and belt, and Mack=s
tennis shoes.








Brent Wayne Watson, a criminalist in the DNA
Serology Section of the Waco
lab, was the next witness.  Watson
described his participation in the investigation of the crime scene in Dublin on August 9, the
collection of samples from there, and his subsequent DNA analysis.  Watson testified that the stain from
appellant=s right
shoe was consistent with a male DNA profile and the stain on his left shoe was
consistent with a mixture of a male DNA profile and a female DNA profile.  The stain on appellant=s
belt was the same profile as was found on appellant=s
right shoe and in the bathroom of the garage. 
The muscle samples from the Bryants=
bodies were too degraded for Watson to extract DNA samples.  Instead, he collected a sample from their son
and sent the various items to the University of North Texas Health Science
Center, DNA Identity Laboratory, in Fort
 Worth.

George William Adams, the evidence custodian for
the DNA Identity Laboratory in Fort Worth,
testified as to the chain of custody for the items of evidence sent to them by
the Waco
lab.  Christina Capt, a forensic DNA
analyst at the DNA Identity Laboratory in Fort
 Worth, was the next witness.  Capt was able to obtain partial DNA profiles
from the Bryants= muscle
tissue.  She was also able to determine
that Henry Bryant IV was the biological son of the Bryants.  Capt=s
DNA analysis proved that the blood of Henry and Anita Bryant was on appellant=s shoes and belt.

Darbi Rierson with the Oklahoma State Bureau of
Investigation identified fingerprints that she had extracted from the body of
Anita Bryant, but she was unable to extract fingerprints from the body of Henry
Bryant.  Walter Henson, a latent print
examiner with the Texas Department of Public Safety, testified that he was
involved in examining the crime scene on August 9, 2004.  Henson confirmed that the fingerprint he
received from Rierson was Anita Bryant=s
by comparing it with the print from her driver=s
license.  Henson also identified
fingerprints of appellant and Mack that were left at the Bryants= residence and the palm print of
appellant that was left on Anita Bryant=s
car.

Texas Ranger Andrew Carter Jr. from Houston was the next
witness.  Ranger Carter testified about
the videotapes from Wal-Mart on Dunvale
 Street in Houston
and documents and digital images that he obtained from Ann Westphal with Wells
Fargo Bank in Houston.  Westphal, a bank investigator with Wells
Fargo Bank, testified that she investigates potentially fraudulent or criminal
activities in the banking system.  She
identified the digital images of appellant making the $13,000 deposit on
Monday, August 9, 2004, at the Wells Fargo Bank branch on Louisiana.








George Adam Sanchez, a loss prevention officer for
Wal-Mart in Houston,
was the eighteenth witness.  Sanchez
identified the video of appellant and Mack using Anita Bryant=s credit card at Wal-Mart on August 9,
2004.

 Ranger
Hutson was recalled, and he testified as to a number of exhibits relating to
the credit card transactions and banking transactions engaged in by appellant
and Mack shortly after the Bryants were murdered.  The State then rested.

Appellant=s
Affirmative Defense of Duress

Appellant=s
trial strategy was to show that he had been compelled to participate in the
crime by Mack=s threat
of imminent death or serious injury.  Tex. Pen. Code Ann. ' 8.05 (Vernon 2003) provides as
follows:

(a) It is an affirmative defense to prosecution
that the actor engaged in the proscribed conduct because he was compelled to do
so by threat of imminent death or serious bodily injury to himself or another.

 

. . . .

 

(c) Compulsion within the meaning of this section
exists only if the force or threat of force would render a person of reasonable
firmness incapable of resisting the pressure.

 

(d) The defense provided by this section is
unavailable if the actor intentionally, knowingly, or recklessly placed himself
in a situation in which it was probable that he would be subjected to compulsion.

 








Appellant was the only defense witness.  Appellant testified that he met Mack at the Ben Reid Center, a halfway house in Houston, while they lived there for two years
as part of their parole. Both were convicted sex offenders.  Appellant was released from the Ben Reid
 Center on July 2,
2004.  The Bryants had lived in Pearland
when appellant moved to the Ben Reid Center,
but they subsequently moved to Dublin.  Appellant made his first trip to Dublin in July; he caught a bus to Waco
where Henry Bryant picked him up and took him to the Bryants= new home in Dublin. 
Appellant stayed there from July 9-11. 
Appellant told Mack about his record collection and the other items of
his that were stored at the Bryants=
home, and Mack said he might be interested in buying some of the records.  Appellant said that he and Mack drove to Dublin on July 24 for
Mack to look at the record albums.  They
loaded some of the albums that Mack selected into the car appellant had rented
and Abrought
them back to Edna with [Mack].@[3]

Appellant stated that his and Henry Bryant=s mother had died in 2001, leaving
$160,000 in certificates of deposit that Henry put in his name when their
mother moved into a nursing home. 
Appellant testified that he never received any financial benefit from
the CDs.  Appellant said that part of
that money belonged to him, that his brother had used the money to build his
house, and that his brother had agreed to pay appellant his $80,000 over
time.  Mack knew that Henry Bryant owed
appellant the money.

Appellant said that he made another trip with Mack
to Dublin on
August 7, 2004, in a dark blue Kia that appellant had rented.  Mack selected some more records, and
appellant put them in the Kia.  Those
were record albums the Rangers found in appellant=s
apartment. Appellant also explained that he had a hobby of listening to police
scanners.

Appellant claimed that he was putting boxes back
in the garage storage room when he heard a Apop,@ turned around, and saw Mack attacking
Henry Bryant with a mallet.  He said that
he tried to stop Mack and that that was why one of the State=s exhibits showed a picture of an
injury to his elbow and scratches to his hand. 
Appellant saw Mack hit his brother with five blows to the head and then
smash his brother=s head in
with a sledgehammer.  Appellant claimed
that the mallet and the sledgehammer belonged to his brother.  Appellant did nothing further to stop Mack
because he was Ascared of
Mack.@  When asked by his counsel if Mack threatened
to kill him, appellant said, ANot
at that time.@  Mack noticed that appellant had blood on him
and made appellant change into some clothes appellant had brought with
them.  Appellant put on his same belt and
shoes and Ajust
happened to notice@ that
Mack had the same kind of shoes that he did. 
Later, they dumped appellant=s
bloody clothes in a dumpster.








Mack told appellant to tell Anita that Henry was
working upstairs in the garage. 
Appellant told Anita, and as she went upstairs, Mack followed her with a
hammer and a piece of weedeater line. 
Appellant claimed that he followed Mack=s
directions because Mack had threatened him several times.  Appellant heard three Apops,@ saw Mack strangling Anita with the
line, and then saw him hit her several times with the hammer.

Appellant described how they loaded the bodies
into the trunk of the Bryants=
Camry and how he looked for credit cards and checkbooks at Mack=s direction.  Appellant said that Mack killed his brother
around 7:00 p.m. and that they stayed at the house until midnight.  Appellant drove the Camry to Oklahoma.  He explained that he had the Oklahoma police radio frequencies in his notebook
because, on a previous trip to Dublin, his
brother had asked him to see if he could pick up any police activity in Oklahoma from Dublin.

Appellant repeated several times that, although
Mack was the same height as appellant, Mack was much stronger than appellant
and that appellant had a back problem. 
After they dumped the bodies in Oklahoma,
they drove back to Dublin,
arriving there about noon, and put the Toyota Camry in the garage.  They stayed at the Bryants= house for about three hours and then
drove back to Edna and Houston. 
Appellant admitted that they used the credit cards at the various
stores, restaurants, and the Shell station. 
He claimed that Mack included the batteries for appellant=s hearing aid in one of their purchases
and that the purchases were made at Mack=s
direction.  Appellant said that Mack
wanted him to keep all the merchandise in appellant=s
apartment.

Although Mack and appellant used the credit cards
at a Radio Shack and a Mexican restaurant in Victoria
(Edna is located between Victoria and Houston), appellant said that Mack
practiced writing the signature AAnita
H. Bryant@ after
they got to appellant=s
apartment in Houston.  Appellant said that he prepared the $3,700
and $9,500 checks to himself but that Mack signed Anita Bryant=s signature.  Even when the Rangers contacted him,
appellant claimed that he was still too frightened of Mack to tell them what
Mack had done. 








During cross-examination by the State, appellant
again admitted his participation in taking the bodies of Henry and Anita Bryant
to Oklahoma.  He again admitted that he told Anita that
Henry was working upstairs in the garage. 
Appellant identified a letter dated October 17, 2003, from his brother
in which Henry Bryant stated that he would not give appellant any more
money.  Appellant said that, when he
visited with his brother on July 9 or 10, his brother changed his mind and
agreed to pay appellant the $80,000. 
Appellant said that his deposit of the two checks (each stating Apayment on settlement@) into his account was not stealing
because he was owed the money.  Appellant
said that Mack had appellant call the banks to make certain there was enough
money in the Bryants=
accounts to cover the checks.  Appellant
said that Mack was driving the Kia around the block while he deposited the
checks.  It also was Mack=s idea for appellant to keep the
drivers= licenses
and credit cards that the Rangers found in his pocket.

The prosecutor pointed out to appellant that the
only thing from the Bryants=
home found at Mack=s
residence was a 7-Up bottle.  Appellant
said that Mack had wanted to take the 7-Up bottle, that there had been some
change in the bottle, but that Mack wanted appellant to keep the change.  The prosecutor asked appellant how, if Mack
killed appellant, would Mack retrieve the money in appellant=s bank account.  Appellant did not know, but he knew Mack
would not hurt him until Mack got the money. 
When asked why the Bryants had been beaten so badly, indicating that
whoever did it was extremely angry, appellant only said that Mack just Aexploded on them.@ Appellant admitted that he was
unemployed at the time of the murders. Appellant also testified that his
brother had all the items that were used to wrap the bodies in the garage:  the U-Haul blankets, the plastic bags, and
duct tape.








The evidence was both legally and
factually sufficient to establish appellant=s
guilt.  Appellant was the one with the
motive B he
believed his brother owed him $80,000 B
to kill and rob the Bryants.  Aside from
appellant=s
testimony, there was no evidence to indicate that Mack benefitted from the
crime.  On the other hand, appellant is
the one who rented the Kia, kept the list of police scanner frequencies, had
the map showing Dublin, had all the merchandise in his apartment, and wrote two
checks to himself purporting to be from Anita Bryant and deposited them in his
account.  Ranger Martin found the forged
signatures of Anita Bryant at appellant=s
apartment. The digital images of appellant depositing the two checks showed
appellant acting alone and even smiling at the bank teller.  The jury may have believed that appellant
left Mack in Edna after they were in Victoria,
and that it was appellant who forged the Anita Bryant signatures.  Appellant admitted filling out the checks
except for the signatures.  Except for
appellant=s
testimony, there is no evidence that Mack was in Houston when the checks were prepared and
deposited.  The photographs taken by
Ranger Martin on August 10 showing the fresh injuries to appellant=s hands and elbow indicated that
appellant was an active participant in the murders.  Appellant=s
fingerprints and palm print were recovered from the crime scene.  DNA evidence demonstrated that the Bryants= blood was on appellant=s shoes and belt.

Other than appellant=s
testimony, there was no evidence that appellant was under duress.  All of the fruits of the crime were in
appellant=s
possession when the Rangers contacted him three days after the murder, yet Mack
did not have anything of value when the Rangers met him on that same day in
Edna.  The video of appellant and Mack at
the Houston Wal-Mart indicated a friendly relationship between the two men, not
one showing duress.  There were hearsay
statements of Mack to the Rangers that the two men had planned the murders in
advance and that appellant was an active participant in the crime.

The jury, as the finder of fact, was the sole
judge of the weight and credibility of the witnesses=
testimony.  Articles 36.13, 38.04.  As the exclusive judge of the facts, the jury
could believe or disbelieve all or any part of appellant=s
testimony.  Evans v. State, 202
S.W.3d 158 (Tex.
Crim. App. 2006); Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App.
1986); Penagraph v. State, 623 S.W.2d 341, 343 (Tex. Crim. App.
1981).  It is obvious that the jury did
not believe appellant=s
testimony concerning duress.  The jury
reached its verdict in one hour and twenty minutes.  The evidence was legally and factually
sufficient to convict appellant on the basis that he was a primary actor in the
homicides and on the basis that he was criminally responsible for Mack=s conduct.  Appellant=s
fifth and sixth points of error are overruled.

Hearsay Testimony

In appellant=s
last point of error, he argues that the trial court erred in allowing Wright to
testify that she overheard a conversation in the Dr. Pepper soda shop in which
Anita Bryant stated that she did not want appellant and his friend coming back
to their house or staying at their house. Wright stated that Anita Bryant=s emotion at the time was fear and
anger.  A trial court=s decision to admit or exclude evidence
is reviewed under an abuse of discretion standard.  Burden v. State, 55 S.W.3d 608, 615 (Tex. Crim. App.
2001).  We will not reverse the trial
court=s ruling
on the admission of evidence as long as the ruling is within the zone of
reasonable disagreement.  Montgomery v.
State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991).  We hold that the trial court did not err in
admitting the testimony as an exception to the hearsay exclusion under Rule
803(3).  The statements expressed Anita
Bryant=s
then-existing state of mind or emotion.








Appellant cites three cases which are
distinguishable.  Vann v. State,
853 S.W.2d 243, 249-50 (Tex. App.CWaco
1993, pet. ref=d),
involved a statement of what the declarant believed the defendant would do in
the future; the statement was not restricted to an expression of the declarant=s state of mind toward the
defendant.  The statements in Buhl v.
State, 960 S.W.2d 927, 932-33 (Tex. App.C
Waco 1998, pet. ref=d),
included the reasons behind the declarant=s
state of mind (previous threats of violence). 
The statement in Navarro v. State, 863 S.W.2d 191, 197 (Tex. App.CAustin 1993), pet. ref=d, 891 S.W.2d 648 (1995), was a
statement by the deceased=s
mother that the deceased said appellant had Aput
a gun to her head and threatened to kill her.@  In this case, Wright did not testify why
Anita Bryant did not want appellant and his friend to visit, what they had done
in the past, or what she feared they would do in the future.

Even if the trial court erred, which we do not
believe that it did, the error was harmless. 
There was overwhelming evidence of appellant=s
guilt.  Appellant admitted his
participation in the crime except for stating that he was not the one who
killed the Bryants with a mallet or hammer. 
The alleged error in admitting Wright=s
testimony, if any, was nonconstitutional and subject to harmless error analysis
under Tex. R. App. P.
44.2(b).  If there was error, we hold
that it was harmless.  Appellant=s seventh point of error is overruled.

This Court=s
Ruling

The judgment of the trial court is affirmed.

 

 

TERRY McCALL

JUSTICE

 

February 8, 2007

Do not publish.  See
Tex. R. App. P. 47.2(b).

Panel
consists of:  Wright, C.J.,

McCall,
J., and Strange, J.











[1]Miranda v. Arizona, 384 U.S.
436 (1966).





[2]Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon 2005).





[3]There was no evidence that the Rangers saw any of the
albums at Mack=s residence when they searched his place.